UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL R. NORRIS,

                    Plaintiff,              Civil Action No. 20-12054

v.                                    Nancy G. Edmunds
                                    United States District Judge

COMMISSIONER OF            David R. Grand
SOCIAL SECURITY,           United States Magistrate Judge

                    Defendant.
_____/

**REPORT AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 16)**

      Plaintiff Michael R. Norris ("Norris") brings this action pursuant to 42 U.S.C. §

405(g), challenging the final decision of Defendant Commissioner of Social Security

("Commissioner") denying his application for Supplemental Security Income ("SSI") and

Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").  Both

parties have filed summary judgment motions (ECF Nos. 14, 16), which have been referred

to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

      For the reasons set forth below, the Court finds that substantial evidence supports

the Administrative Law Judge's ("ALJ") conclusion that Norris is not disabled under the

Act.  Accordingly, the Court **RECOMMENDS** that the Commissioner's Motion for

Summary Judgment **(ECF No. 16)** be **GRANTED**, Norris' Motion for Summary Judgment

**(ECF No. 14)** be **DENIED**, and that pursuant to sentence four of 42 U.S.C. § 405(g), the

ALJ's decision be **AFFIRMED**.

## II.    REPORT

### A.    Background

Norris was 41 years old at the time of filing his applications on February 28, 2018. (PageID.132, 134).[1]   At 6'1" tall, he weighed approximately 210 pounds during the relevant time period.   (PageID.106).   He completed high school and has a GED. (PageID.84-85).   Previously, Norris worked as a professional bowler.   (PageID.83-84, 240).   He currently lives with his wife, their child, and his wife's grandparents in a two-bedroom bungalow.   (PageID.83).   Norris' alleged disabling conditions include multiple sclerosis, acute kidney failure, influenza, severe back pain, bulging disc, double vision, chronic obstructive pulmonary disease, depression, acute psychosis, and high blood pressure and cholesterol.   (PageID.88-90, 107).   In his applications, he alleged a disability onset date of November 1, 2017.   (PageID.209, 216).

After Norris' applications for SSI and DIB were denied at the initial level on June 11, 2018 (PageID.138-42, 159-63), he timely requested an administrative hearing, which was held on February 21, 2019, before ALJ Carol Guyton (PageID.74-105).   Norris, who was represented by attorney Kerry Spencer, testified at the hearing, as did vocational expert ("VE") Harry Cynowa.   (*Id.*).   On May 1, 2019, the ALJ issued a written decision finding that Norris is not disabled under the Act.   (PageID.54-68).   On June 10, 2020, the Appeals Council denied review.   (PageID.46-51).   Norris timely filed for judicial review of the final

---

[1] Standalone citations to "PageID.___" are all to the administrative transcript in this case, which can be found at ECF No. 11.

2

decision on July 30, 2020.  (ECF No. 1).

The Court has thoroughly reviewed the transcript in this matter, including Norris' medical record, function and disability reports, and testimony as to his conditions and resulting limitations.  Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

**B.      The ALJ's Application of the Disability Framework Analysis**

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Norris is not disabled under the Act.  At Step One, the ALJ found that Norris had not engaged in substantial gainful activity since November 1, 2017.  (PageID.59).  At Step Two, the ALJ found that he had severe impairments of multiple sclerosis ("MS"), lumbar radiculopathy, and chronic obstructive pulmonary disease ("COPD").  (PageID.60).  At Step Three, the ALJ found that Norris' impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (PageID.61-62).

The ALJ then assessed Norris' residual functional capacity ("RFC"), concluding that he is capable of performing light work, with the following additional limitations:

> [t]he claimant can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, but can never climb ladders, ropes, or scaffolds.  He must also avoid concentrated exposure to extreme cold, heat, and avoid concentrated exposure to vibration, fumes, dust, odors, gases, and poor ventilation.  The claimant can frequently

4

handle and finger with the bilateral upper extremities.  Additionally, the claimant needs the ability to alternate between sitting and standing every 45 minutes.  He is also limited to occasionally lifting and/or carrying 15 pounds, frequently lifting and/or carrying 10 pounds, standing and/or walking for 6 hours in an 8-hour workday, and sitting for 6 hours in an 8-hour workday.

(PageID.62).

At Step Four, the ALJ found that Norris is unable to perform his past relevant work as a professional athlete.  (PageID.66).  At Step Five, the ALJ found, based in part on the VE's testimony, that given Norris' age, education, work experience, and RFC, he was capable of performing light unskilled work with an SVP of 2 as a hand packager, small products assembler, and visual inspector checker.  (PageID.67-68).  As a result, the ALJ concluded that Norris was not disabled under the Act.  (PageID.68).

### C.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted).  The phrase "substantial evidence" is a "term of art …." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).  "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Id*. (internal citations omitted).

"And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.   Substantial evidence … is 'more than a mere scintilla.'" *Id.* (internal citations omitted).   Specifically, "[i]t means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (internal citations omitted).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.   *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).   The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.   *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.   *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."   *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

### D.    Analysis

In his motion for summary judgment, Norris argues that the ALJ erred in: (1) failing to consider all of his impairments in combination when determining his RFC; (2) failing to

properly consider medical opinion evidence from his treating neurologist, Dr. Ram S. Garg, M.D., in determining his RFC; and (3) finding that his MS did not meet "Listing 11.09C." (ECF No. 14, PageID.729-37).  These arguments are addressed in turn below.

### 1.   *Substantial Evidence Supports the ALJ's RFC Determination*

#### a.   The ALJ Considered the Combined Effects of All Impairments

Norris first broadly asserts that the ALJ "failed to incorporate limitations based upon all of [his] severe impairments into [the RFC] determination."  (ECF No. 14, PageID.729). But this assertion is clearly belied by the record; a review of the ALJ's decision at Step Three reflects that she thoroughly discussed medical evidence of Norris' MS, lumbar radiculopathy, and COPD, finding that, despite this "combination of severe impairments," his physical examinations are "mostly benign," they show that his COPD is "stable," and he is still "able to perform activities of daily living without limitations."  (PageID.64-66). The ALJ further stated that the RFC "accommodates the claimant's severe impairments by limiting him to light exertional capacity" and by adding postural, manipulative, and environmental restrictions "for his comfort and to guard against any exacerbations." (PageID.66).

Norris next argues that the ALJ failed to "consider the combined effect of all impairments including those deemed non[-]severe."  (ECF No. 14, PageID.729-30); *cf.* 20 C.F.R. § 416.923(c) ("[W]e will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.").  As set forth below, however, the ALJ's analysis throughout the decision satisfies this requirement.

For example, the ALJ stated at Step Three that she had considered "all of [Norris']" impairments individually and in combination" to determine whether his impairments met or equaled a listing.  (PageID.61).  Moreover, in addressing the RFC, the ALJ stated that she had considered "the entire record" and based her conclusion on "the totality of the evidence."  (PageID.62, 66).  Particularly given the ALJ's thorough discussion of the record evidence, this is sufficient.  *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 851 (6th Cir. 2020) ("[T]he ALJ's statements that she had considered the entire record and all of [claimant's] symptoms suggest that she had considered [claimant's] impairments in combination.") (citing *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 591-92 (6th Cir. 1987)).  To add further, the ALJ cited to 20 C.F.R. § 416.945 and SSR 96-8p, stating that, "in making [the RFC] finding, [she] must consider all of claimant's impairments, *including impairments that are not severe.*"  (PageID.58-59) (emphasis added); *see Emard*, 953. F.3d at 851 (concluding that an ALJ's specification in her summary of the applicable law that she was required to comply with SSR 96-8p's mandate to consider all impairments supported the conclusion that she had complied); 20 C.F.R. § 416.945 (stating that all medically determinable impairments, including those that are "not 'severe'" will be assessed in combination).

As to specifics, the ALJ expressly noted Norris' non-severe impairments – including acute kidney failure, influenza, severe back pain, a bulging disc, essential hypertension, hyperlipidemia, high blood pressure, high cholesterol, depressive disorder, acute

psychosis, and optic neuritis – and his reported associated symptoms.  (PageID.60-64, 66).[2]

However, the ALJ found that his reported symptoms were not entirely consistent with the record, based in part on his reported ability to engage in daily activities "without limitations," such as attending to his personal care needs, regularly engaging in social activities, managing money, watching television, bringing his son to school, and playing games on his phone.  (PageID.66).[3]  This analysis (which Norris does not challenge) directly rebuts his assertion that the ALJ "does not account for [non-severe] impairments in her rationale for the RFC" assessment.  (ECF No. 14, PageID.732).

### b.  Substantial Evidence Supports the ALJ's RFC Finding

Finally, Norris argues that the ALJ's RFC finding "appears both arbitrary and unsupported by substantial evidence of the record."[4]  (ECF No. 14, PageID.732).  As set forth below, however, substantial evidence supports the ALJ's RFC finding that Norris

---

[2] Norris does not challenge the ALJ's finding that these other impairments are non-severe and, thus, waived any challenge to this finding.  *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (undeveloped claims are waived).

[3] The ALJ also based the RFC, in part, on the assessment of the state agency physician, Dr. David Kroning, M.D., who specifically considered Norris' acute kidney failure, influenza, severe back pain, bulging disc, high blood pressure, high cholesterol, arthritis, hypertension, asthma, and use of multiple pain medications before concluding that he could perform light work with some environmental limitations.  (PageID.65, 115-16); s*ee Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 443 (6th Cir. 2010) (ALJ adequately accounted for impairment by relying on opinion of state agency physician who considered it).  And again, Norris does not challenge the ALJ's reliance on this opinion.  *See Kennedy*, 87 F. App'x at 466 (undeveloped claims are waived).

[4] In making this argument, Norris also points to the ALJ's incorporation of some portions of Dr. Garg's opinions, but rejection of other portions.  (ECF No. 14, PageID.731-32).  The ALJ's evaluation of Dr. Garg's opinion will be addressed in more detail below in the next section.

could perform light work[5] with some added limitations.  (PageID.62-63).

As an initial matter, the Court notes that Norris' motion relies almost exclusively on Dr. Garg's treatment records, while barely, if at all, addressing treatment notes and medical opinions from different medical sources.  (*See generally* ECF No. 14, PageID.729-37).  For instance, his motion does not even mention (much less challenge) the ALJ's reliance on the two opinions by the state agency reviewing physicians, and only briefly summarizes (but does not make any arguments for or against) Dr. Bray's opinion after a mental status examination.  (*See* PageID.727).  While Dr. Garg had the most frequent interactions with Norris (PageID.478-567, 595-695), the record as a whole contains numerous medical records and treatment notes from other sources starting as early as May 2016 through at least November 27, 2018, that provide substantial support for the ALJ's RFC finding.  (*See, e.g.*, PageID.450, 591).

For example, treatment notes at Michigan Medical Group reflect that Norris was seen for chronic back pain and sciatica in May 2016, but physical exams through August 2016 consistently indicate normal findings.  (PageID.450, 448, 447).  In March 2017, Norris received an x-ray of his lumbosacral spine, which was "negative" and showed "no acute process" at T12-L1.  (PageID.445).  While physical exams in July and September 2017 noted lumbosacral tenderness on palpitation (PageID.436, 438), a subsequent exam on November 28, 2017, reflected normal findings again (PageID.434).  Later, in February

---

[5] The applicable Social Security regulations define light work as "involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

2018, despite Norris' complaints of joint stiffness, muscle pain, herniated disc, and chronic pain, physical exams indicated he was well developed and nourished; had a normal affect and normal gait; was negative for muscle weakness, atrophy, and swelling; and had normal strength and tone in all extremities.  (PageID.432, 491).  Between March and November 2018, follow-up exams consistently reflected these same normal findings.  (PageID.587-91).

In addition, Norris' own function report dated April 2, 2018, states that he has no problems with personal care; he goes outside daily; he is able to handle his own finances; he has no problems with getting along with people; he watches television and plays video games daily; his disability does not affect his squatting, reaching, kneeling, talking, completing tasks, understanding, following instructions, or using hands; he does a "good" job in following written or spoken instructions; he finishes what he starts; he does "ok" in dealing with stress and changes in routine; and he is "good" with authority figures. (PageID.258-64).

This function report is also consistent with what Norris reported to Dr. Hugh Bray during a mental status examination on May 31, 2018, including that he is mentally "fine now," he sees a friend "regularly," he does not "get frustrated or angry anymore," and his "meds are working well."  (PageID.577-79 (reporting also that he has no problems in social functioning and does activities of daily living "independently, but slowly")).  At the exam, he presented with a depressed mood, but otherwise had adequate grooming and hygiene; had a normal posture and gait; did not exhibit unusual or bizarre behavior; had appropriate insight, judgment, and eye contact; was talkative, cooperative, and logical; and denied

hallucinations, delusions, or suicidal ideations.  (PageID.579).  Based on the exam, Dr. Bray opined that Norris was mildly impaired in his ability to "relate to others," "understand, remember, and carry out tasks," and "maintain attention, concentration, persistence, pace, and effort," and moderately impaired in his ability to "withstand stress and pressure" associated with work activities.  (PageID.581).[6]

Further, in June 2018, state agency psychological evaluator Dr. Dyan Hampton-Aytch, Ph.D., opined that Norris' alleged impairments and diagnosed conditions are notably inconsistent with his reported symptoms, and that he had only "mild limitations" in the four areas of mental functioning.  (PageID.111-13).  Dr. Kroning's RFC assessment in May 2018, also provides substantial evidence supporting the ALJ's even more restrictive RFC finding,[7] as he opined that Norris can lift or carry 20 pounds occasionally and 10 pounds frequently; can stand, walk, or sit with normal breaks for 6 hours in an 8-hour workday; frequently stoop, kneel, crouch, and crawl; occasionally balance and climb ramps or stairs, but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposures of extreme cold, vibration, fumes, odors, and poor ventilation.  (PageID.114-17).[8]

---

[6] The ALJ ultimately found Dr. Bray's opinion to be not persuasive, specifically because his opinion that Norris "has moderate limitations in the ability to withstand stress at work is not supported by the medical evidence, which shows no significant mental limitation."  (PageID.65).

[7] The ALJ's RFC added greater limitations by "also includ[ing] a sit/stand option to accommodate for the claimant's back complaints" (*i.e.*, the ability to alternate between sitting and standing every 45 minutes), and "further add[ing] postural, manipulative, and environmental restrictions for his comfort and to guard against any exacerbations" (*i.e.*, limiting to lifting or carrying to 15 pounds, and occasional stooping, crouching, crawling, or kneeling).  (PageID.65-66).

[8] Dr. Kroning did not opine any limitations as to twisting, bending, or stooping.

Significantly, even Dr. Garg's own treatment records reflect that, despite Norris' subjective complaints of debilitating symptoms, concurrent physical examinations consistently indicated normal, unremarkable findings other than a positive Babinski Test. For instance, on October 5, 2017, though Norris complained of double vision, pain in his lower back and legs, tremors, loss of balance, and difficulty with walking, breathing, and sleeping, a physical exam that same day reflected that he presented with normal and appropriate affect; normal speech, thought, and cognitive functions; vibration and tactile location globally intact; 5/5 normal strength for all muscles; no impairments in coordination while walking; normal gait; normal strength and tone in all upper and lower extremities; and flexion in his bilateral plantar reflexes. (PageID.567-68). Over Norris' next visits through November 16, 2017, Dr. Garg's physical exams reflected these same normal findings, with Norris even reporting during the latter half that "[r]ecently the disease has been improving." (PageID.514-65).

To be sure, between November 20, 2017, and January 24, 2019, Norris visited Dr. Garg approximately 27 times, often reporting that "the disease has been worsening" and describing symptoms of blurred or double vision, decreased range of motion, leg and muscle weakness, decreased memory, numbness, tingling tremor, trouble walking, unsteadiness, inability to concentrate, and insomnia. (PageID.477-511, 597-610, 617-77). In contrast to his complaints, however, Dr. Garg's concurrent physical exams at those visits reflect the *same normal* findings (aside from the positive Babinski) as was previously assessed in his earlier October 2017 exam. (PageID.598-99, 602-03, 610-11, 614-15, 618-19, 622-23, 626-27, 630-31, 634-35, 638-39, 642-43, 646-47, 650-51, 654-55, 658-59, 661-

13

62, 665-66, 669-70, 673-74, 677-78).   In fact, by July 12, 2018, Norris reported improvements in his ability to "ambulate[] well" with "no aid," and between October 2018 and January 2019, consistently reported an ability to engage in activities of daily living "without limitations."  (PageID.597, 601, 605, 609, 613, 617, 621, 625, 629, 633, 637).

Given these facts, the ALJ supportably concluded that Norris could perform light work with some added limitations.  It remains Norris' burden to show any error in this determination – or to show that the ALJ should have found him more limited based on the combined effects of his impairments – and he has not done so here.  *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008) (claimant has the burden of demonstrating need for a more restrictive RFC).  Accordingly, for all the foregoing reasons, Norris fails to show any error in the ALJ's RFC finding, which is supported by substantial evidence.

### 2.  *The ALJ Properly Evaluated Dr. Garg's Opinions*

In his motion, Norris argues that the ALJ failed to comply with the "treating physician doctrine" and "evaluate Garg's opinion in light of the supportability factors," as "required by 20 C.F.R. § 404.1527(c)."  (ECF No. 14, PageID.732-34).  He also challenges the ALJ's incorporation of "some of Dr. Garg's [] restrictions (such as Plaintiff's need to alternate between sitting and standing and Plaintiff's carrying restrictions)" but rejection of "others (such as Garg's opinion that Plaintiff can <u>never</u> twist, stoop, or crouch, and Garg's opinion that Plaintiff would likely be absent more than 4 days per month due to his impairments)."  (*Id.*, PageID.730).  His arguments are misguided.

First, as the Commissioner points out, the treating physician rule was no longer in effect when Norris filed his applications in February 2018, as that rule was abrogated for

claims filed on or after March 27, 2017.  (ECF No. 16, PageID.755); s*ee* 20 C.F.R. §

404.1520c ("For claims filed . . . on or after March 27, 2017, . . . [w]e will not defer or give

any specific evidentiary weight, including controlling weight, to any medical opinion(s) ...

including those from your medical sources."); *see also Revisions to Rules Regarding the*

*Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5852-57

(Jan. 18, 2017); *Word v. Comm'r of Soc. Sec.,* No. 18-00187, 2019 WL 2396556, at *9 n.6

(E.D. Tenn. June 6, 2019) ("The new regulations eliminate the term 'treating source,' as

well as what is customarily known as the treating source or treating physician rule.").

Rather, the applicable regulatory criteria for evaluating medical opinions for Norris'

claims, filed in February 2018, is set forth at 20 C.F.R. § 404.1520c.  That regulation

provides that ALJs must rely on the following factors when evaluating medical opinions:

(1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization;

and (5) other factors.  20 C.F.R. § 404.1520c(c).  Among these, the most important factors

in this analysis are a medical opinion's supportability and consistency with other sources

in the record.  *Id.* § 404.1520c(b)(2); *see also Id.* § 404.1520c(c)(2) ("The more consistent

a medical opinion(s) or prior administrative medical finding(s) is with the evidence from

other medical sources and nonmedical sources in the claim, the more persuasive the

medical opinion(s) or prior administrative medical finding(s) will be.")

In this case, Dr. Garg issued two opinions on February 5, 2019, in the form of a

medical source statement (PageID.707-08) and a physical RFC assessment (PageID.711-

13).  As to the first, Dr. Garg's medical source statement stated that Norris was unable

bend, twist, or stoop; was unable lift, push, or pull more than 15 pounds; would have

difficulty standing or walking due to pain, loss of balance, and incoordination; and was incapable of performing a full-time job.  (PageID.707-08).

As to the second, Dr. Garg's physical RFC assessment stated that Norris can occasionally lift and carry 15 pounds; can stand or walk for a total of two hours in an eight hour workday for one half hour at a time due to pain in back legs, loss of balance, and incoordination; has no limitations in sitting, reaching, handling, or fingering; needs to take a half hour break every one to two hours for a total of two hours in an eight-hour workday; and is likely to be absent from work for more than four days per month.  (PageID.711-12).[9] Dr. Garg further opined that Norris could never twist, stoop, crouch, and climb ladders or stairs; can rarely look down with sustained flexion of the neck; can occasionally look up, turn his head to the side, and hold his head in static position; would frequently experience pain or symptoms interfering with the attention and concentration needed to perform even simple work tasks; and was limited by blurred or loss of vision and a need to avoid extreme temperatures.  (PageID.713).

In evaluating these two opinions, the ALJ found persuasive Dr. Garg's functional restrictions limiting Norris to lifting, pushing, or pulling no more than 15 pounds because "they are consistent with the evidence of record as well as Dr. Garg's own finding upon examination."  (PageID.65).  However, the ALJ found the rest of Dr. Garg's medical source statement not persuasive because "the other limitations are not consistent with treatment records.  Further, the limitations provided do not specify time limits for standing and/or

---

[9] Dr. Garg also noted loss of vibration sense, incoordination, and decreased range of motion in flexion, extension, lateral bending, and rotation.  (PageID.711).

walking or define the frequent breaks that are needed." (*Id.*). Similarly, the ALJ found Dr. Garg's physical RFC assessment not persuasive, "as it is inconsistent with the claimant's treatment records. Although the record does support limiting the claimant to fifteen pounds for lifting and/or carrying." (PageID.65-66).

Here, to start, because the treating physician rule does not apply to Norris' claims, his general argument that the ALJ failed to articulate "good reasons" for the weight given to a treating source's medical opinion is misguided. While ALJs had been required under the old treating physician rule to provide "good reasons" for the weight given to treating source opinions, that obligation is not part of the new framework for evaluating medical opinion evidence as provided in 20 C.F.R. § 404.1520c(c). *See Lapka v. Comm'r of Soc. Sec.*, No. 20-10035, 2021 WL 942752, at *15 (E.D. Mich. Jan. 4, 2021) (rejecting claimant's attempt "to try to force the [former] good-reasons analysis and precedent into the articulation requirement" for claims filed after March 27, 2017), *report and recommendation adopted*, No. 20-10035, 2021 WL 733234 (E.D. Mich. Feb. 25, 2021). Moreover, while Norris argues that the ALJ merely cited that the opinion was "not consistent with treatment records" without "evaluat[ing] Garg's opinion in light of the supportability factors" (ECF No. 14, PageID.734), the regulations state that one of the most important factors in the analysis is an opinion's consistency with the record as a whole. And here, the ALJ's decision reflects that she relied heavily on the consistency (or lack thereof) of Dr. Garg's two opinions with the medical record evidence. (PageID.63-64).

For example, as to Dr. Garg's own treatment notes, the ALJ cited exams in October 2017, noting that, despite Norris' reported symptoms, a "concurrent physical exam [by Dr.

17

Garg] was grossly unremarkable," and his MS "has been improving" with effective medication.  (PageID.63-64; *see* PageID.545, 567-68).  The ALJ further accounted for the "longitudinal evidence of record," noting that while "subsequent neurology treatment records from February 2018 to January 2019" reflect complaints that his MS was worsening, in contrast, his physical exams during that same period "are mostly benign." (PageID.64, 66).  Notably, the ALJ discussed his most recent follow-up office visit on January 24, 2019, noting that "despite the [MS], [Norris] is able to perform activities of daily living without limitations" and "ambulate well," a physical exam that same day showed "no edema, normal cognitive function, intact global sensory responses, 5/5 strength, no impairment of tandem walking, normal gait, and a positive Babinski," and Dr. Garg himself assessed "no heavy lifting, pushing, or pulling over 15 lbs." (PageID.64, 66; *see* PageID.597-600).

In addition to Dr. Garg, the ALJ discussed numerous medical records from other sources in making her findings.  Among other records, the ALJ noted that a February 2018 physical exam with the Michigan Medical Group indicated that he had "[no] muscle weakness, atrophy, swelling, and redness, a normal gait, lungs that were clear to auscultation, no acute distress, and normal heart sounds."  (PageID.64; *see* PageID.432). The ALJ also noted that records between June and July 2018 reflected Norris' COPD to be "stable," and that he denied "chest pain, shortness of breath, nausea, muscle weakness, numbness, tingling, tremors, mood changes, or anxiety."  (PageID.64; *see* PageID.587-88).

The ALJ further discussed Dr. Bray's May 2018 mental status exam, noting that they indicated "adequate contact with reality, adequate to diminished self-esteem,

18

appropriate insight and judgment, appropriate eye contact, goal-directed thought processes, a depressed mood, a pleasant and friendly emotional reaction, full orientation, and normal concentration."  (PageID.64; *see* PageID.579-80).   The ALJ also found persuasive the opinions of the two state agency physicians who assessed Norris with mild limitations in the four areas of mental functioning and far less restrictive physical limitations than those in Dr. Garg's opinions.  (PageID.64-65).

Finally, Norris' challenge to the ALJ's incorporation of some of Dr. Garg's restrictions (but not others) is without merit, as there is nothing "arbitrary" about finding persuasive only the portions of an opinion that are consistent with the medical record evidence.  *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x. 267, 275 (6th Cir. 2015) (stating that, even where an ALJ provides "great weight" to a medical opinion, there is no requirement that an ALJ adopt the opinion "verbatim" or adopt opined limitations "wholesale").[10]  Moreover, Dr. Garg's estimate that Norris is likely to be absent from work for more than four days per month is not a "medical opinion," nor is it entitled to any special significance.  *See Murray v. Comm'r of Soc. Sec.*, No. 10-297, 2011 WL 4346473, at *7 (W.D. Mich. Aug. 25, 2011) ("A treating physician's estimate of how often a patient

---

[10] As discussed at length above, the ALJ incorporated lift/push/pull restrictions in Dr. Garg's opinions consistent medical record evidence (*i.e.*, Dr. Garg's assessments in his treatment notes, other physical exams, and Dr. Kroning's opinion), while rejecting restrictions of never twisting, stooping, or crouching, and difficulty standing or walking due to pain, loss balance, and incoordination that were inconsistent with the evidence (*i.e.*, Dr. Kroning's opinion, Norris' recent statements that he can engage in activities of daily living "without limitations" and "ambulate well," and a litany of physical exams – including Dr. Garg's – between October 2017 and January 2019 indicating normal physical exam findings).  *See Cangialosi v. Comm'r of Soc. Sec.*, No. 13-10210, 2014 WL 1260711, at *3-4 (E.D. Mich. Mar. 27, 2014) (ALJ permissibly discounted a treating physician's opinion based on mostly normal physical examination findings, such as normal gait and normal neurological findings).

who is not working would likely be absent from work if he had a job is not a medical opinion, and it is not entitled to any particular weight.").

In short, Norris' assertion that "[t]here is nothing in the record to indicate that Garg's findings were inconsistent and the ALJ does not cite to instances in the record where she found evidence contrary to Garg's specific findings" is simply unfounded. (ECF No. 14, PageID.734). While Norris may point to some evidence from Dr. Garg that is consistent with him experiencing certain symptoms and physical limitations, the ALJ's evaluation of Dr. Garg's opinion is supported by substantial evidence in the record as a whole. *Cutlip*, 25 F.3d at 286.

3. *The ALJ's Finding that Norris Did Not Meet Listing 11.09 Under An Outdated Version Was Harmless Error*

In his motion, Norris argues that his MS meets "Listing 11.09C," and the ALJ's "summarily dismissing the listing in a cursory manner" is "not supported by substantial evidence." (ECF No. 14, PageID.735-37). He asserts that treatment records (again, almost exclusively from Dr. Garg) indicating complaints that his impairments and symptoms were worsening "suggest[] that the disease is far more debilitating that the ALJ finds it to be." (ECF No. 14, PageID.737).[11]

In response, the Commissioner concedes that "[a]dmittedly, the ALJ erred by applying an *older* version of the Listing," but nonetheless argues that the "error did not

---

[11] Norris also reiterates that, "as previously noted, the ALJ did not properly evaluate Garg's opinion under the regulations and does not point to evidence to discredit the severity of Plaintiff's MS or Garg's opinion." (ECF No. 14, PageID.737). Based on the lengthy analysis above in the preceding sections, this argument is without merit.

harm Plaintiff because the evidence still does not come close to satisfying any of the requirements of the *applicable* Listing."  (ECF No. 16, PageID.761) (emphasis in original).

As an initial matter, while the Commissioner admits that the ALJ applied an outdated version of Listing 11.09 at Step Three, Norris never raised such a challenge in his motion for summary judgment, nor did he file a reply brief responding to the Commissioner.  Thus, Norris has waived any argument for remand based on the ALJ's misapplication of an outdated version of Listing 11.09.  Indeed, he has not at all articulated how the evidence would have established that his impairments met or medically equaled Listing 11.09 under the applicable version.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the courts to . . . put flesh on its bones."); *see also Moats v. Comm'r of Soc. Sec.*, No. 20-00265, 2021 WL 2905079, at *18 (N.D. Ohio Jan. 8, 2021).

In any case, Norris fails to show either that his impairments meet or medically equal Listing 11.09C under the outdated version, or that the ALJ's misapplication of an outdated listing amounts to more than harmless error.  First, taking Norris' argument as presented under the outdated version, his assertion that he met Listing 11.09C fails.  In relevant part, the ALJ found that:

> The claimant's impairments failed to meet the listing for 11.09 (Multiple Sclerosis), because the record, consistent with the findings below [in discussing the RFC], does not demonstrate the claimant has Multiple Sclerosis with: . . . (C.) significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive

> activity, demonstrated on physical examination, resulting from
> neurological dysfunction in areas of the central nervous system known
> to be pathologically involved by the multiple sclerosis process (see 20
> CFR Part 404 Subpart P, Appendix 11, § 11.09).

(PageID.62).

In challenging this determination, Norris argues that Dr. Garg's treatment notes consistently indicate a worsening of his MS and related symptoms, but his argument rests heavily (if not entirely) on his subjective complaints reported in the History of Present Illness ("HPI") and Review of Systems ("ROS") sections.   (*See* PageID.735-37); *McCready v. Comm'r of Soc. Sec.*, No. 10-13893, 2012 WL 1060088 (E.D. Mich. Mar. 2, 2012) (agreeing with the Commissioner that the HPI section of treatment notes "are merely the narrative description of plaintiff's subjective complaints and symptoms and are not opinions regarding plaintiff's limitations or restrictions"), *report and recommendation adopted*, No. 10-13893, 2012 WL 1059747 (E.D. Mich. Mar. 29, 2012).[12]   However, to meet Listing 11.09C, Norris was required to show "significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, ***demonstrated on physical examination,*** resulting from neurological dysfunction" based on his MS – and he fails to do so here.   20 C.F.R. Pt. 404, subpt. P, app. 1 § 11.09C (effective May 24, 2016,

---

[12] *See also Review of Systems*, AMERICAN COLLEGE OF CARDIOLOGY, *https://www.acc.org/Tools-and-Practice-Support/Practice-Solutions/Coding-and-Reimbursement/Documentation/Evaluation-and-Management/Review-of-Systems* ("The Review of Systems (ROS) is an inventory of the body systems that is obtained through a series of questions in order to identify signs and/or symptoms which the patient may be experiencing."); AAP Division of Health Care Finance and Quality Improvement, *How Does Review of Systems Differ From History of Present Illness?*, AAP NEWS, https://www.aappublications.org/content/34/7/25 ("The ROS differs from the HPI in that it includes questions asked of the patient or caregiver relating to body systems. . . . It is important to remember that the ROS is gathered through a series of questions asked either verbally or through an intake sheet or questionnaire.")

to Sept. 28, 2016) (emphasis added).

Specifically, his motion cites to the ROS and HPI portions of Dr. Garg's treatment notes on March 23, 2018, and December 18, 2018, to argue that he "reported worsening of [his relapsing-remitting type multiple sclerosis and] nearly all symptoms" (ECF No. 14, PageID.736; *see also* PageID.481, 601-02), but Dr. Garg's concurrent ***physical examinations*** during those same visits reflect normal physical and neurological findings, including "normal strength and tone" in all musculoskeletal extremities; "5/5 normal muscle strength" in all muscles; no impairments in tandem walking or coordination; sensory systems "Globally" intact; "normal" gait and posture; and alertness and orientation times four. (PageID.482-83, 602-03). As discussed above in detail, the ALJ reasonably relied on Dr. Garg's physical exams, treatment records and physical exams from other medical sources, and the findings and opinions of the state agency reviewing physicians to find that the medical record evidence did not fully support Norris' allegations of pain and other symptoms. (PageID.63-66).

Second, even assuming Norris has not waived his challenge to the ALJ's misapplication of an outdated listing, such error is harmless. In the Sixth Circuit, the law is clear that courts will not overturn an ALJ's decision where a failure to articulate Step Three findings was harmless. *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014). While the ALJ's error in this case was not a failure to articulate her findings, but in misapplying her findings to an older version of a listing, caselaw has generally recognized that courts "review decisions of administrative agencies for harmless error." *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654-55 (6th Cir. 2009)

23

(holding that where an "agency has failed to adhere to its own procedures," courts will not remand for further proceedings unless "the claimant has been prejudiced on the merits or deprived substantial rights because of the agency's procedural lapses."); *see also M.G. v. Comm'r of Soc. Sec*, 861 F. Supp. 2d 846, 860 (E.D. Mich. 2012) ("[T]his Court will review the record to determine whether the ALJ's failure to analyze the elements of Listing 112.10 is harmless."). As such, the ALJ's error here is subject to harmless error review.

In challenging an ALJ's Step Three findings, it is incumbent upon the claimant to "point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing . . . . Absent such evidence, the ALJ does not commit reversible error by failing to [properly] evaluate a listing at Step Three." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014); *see also Forrest*, 591 F. App'x at 366 ("even if these reasons failed to support the ALJ's step-three finding, the error is harmless, because Forrest has not shown that his impairments met or medically equaled in severity any listed impairment . . . ."); *M.G.*, 861 F. Supp. 2d at 861 (finding harmless error where "'concrete factual and medical evidence' is 'apparent in the record' and shows that even if the ALJ had made the [correct] required findings, the ALJ *would have* found the claimant not disabled").

Because Norris filed his application in February 2018, the applicable version of Listing 11.09 provides that he must establish one of the following:

> A.  Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; or

      B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:

          1. Understanding, remembering, or applying information (see 11.03G3b(i)); or
          2. Interacting with others (see 11.00G3b(ii)); or
          3. Concentrating, persisting, or maintain pace (see 11.00G3b(iii)); or
          4. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. Pt. 404, subpt. P, app. 1 § 11.09 (effective August 22, 2017, to March 13, 2018).[13]

Here, Norris fails to show that he could have met Listing 11.09A. First, he never argues (nor points to any evidence in the record) that he requires assistance from another person or use of a walker, two crutches, or two canes to stand up from a seated position or balance while standing or walking, as specified in § 11.00D2. *See* 20 C.F.R. Pt. 404, subpt. P, app. 1 § 11.00D2. As discussed above, Norris routinely ambulated well during physical

---

[13] In relevant part, 20 C.F.R. Pt. 404, subpt. P, app. 1 § 11.00D1-2 provides that:

    Disorganization of motor function means interference, due to your neurological disorder, with movement of two extremities. . . . By two extremities we mean both lower extremities, or both upper extremities, or one upper extremity and one lower extremity . . . that results in an extreme limitation in your ability to: a. Stand up from a seated position; or b. Balance while standing or walking; or c. Use the upper extremities (including fingers, wrists, hands, arms, and shoulders).

    Extreme limitation means the inability to stand up from a seated position, maintain balance in a standing position and while walking, or use your upper extremities to independently initiate, sustain, and complete work-related activities. . . .

    Inability to stand up from a seated position means that once seated you are unable to stand and maintain an upright position without the assistance of another person or the use of an assistance device, such as a walker, two crutches, or two canes. [] Inability to maintain balance in a standing position means that you are unable to maintain an upright position while standing or walking without the assistance of another person or an assistive device, such as a walker, two crutches, or two canes. [] Inability to use your upper extremities means that you have a loss of function of both upper extremities (including fingers, wrists, hands, arms, and shoulders) that very seriously limits your ability to independently initiate, sustain, and complete work-related activities involving fine and gross motor movements. . . .

examinations.  Moreover, whereas Norris makes a single, passing reference in his motion to a subjective complaint about weakness in his "upper" extremities during an exam on October 10, 2017 (ECF No. 14, PageID.731), the ALJ specifically assessed that Norris "can frequently handle and finger with the bilateral upper extremities," which, as discussed above, is supported by substantial evidence.  (PageID.62; *see, e.g.*, PageID.483, 603 (finding normal strength and tone in both upper extremities)).

Likewise, Norris fails to show that he could have met Listing 11.09B.  Specifically, he does not challenge the ALJ's Step Two "paragraph B"[14] findings that Norris has no more than a "'mild' limitation in any of the functional areas," including "understanding, remembering, and applying information," "interacting with others," "concentrating, persisting, or maintaining pace," and "adapting or managing himself."  (PageID.60-61). Thus, he cannot satisfy Listing 11.09B's requirement of showing a "marked limitation" in one of the four areas of mental functioning.[15]

In summary, it is "apparent in the record" from the ALJ's specific findings and the medical evidence that, had she applied the correct version of the listing, she necessarily would have found that Norris fails to meet or medically equal Listing 11.09.  *See M.G.*, 861 F. Supp. 2d at 861.  Accordingly, such error is harmless, and Norris is not entitled to

---

[14] The ALJ noted that "[t]he limitations identified in the 'paragraph B' criteria are not a [RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. . . . Therefore, the following [RFC] assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental functional analysis."  (PageID.61).

[15] Based on the ALJ's RFC finding that he can perform light work with some added limitations, Norris also could not show that the ALJ would have found a "marked limitation" in physical functioning under the applicable version of Listing 11.09B.  *See M.G.*, 861 F. Supp. 2d at 861.

remand on this basis.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, that decision should be affirmed.

## III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 16)** be **GRANTED**, Norris' Motion for Summary Judgment **(ECF No. 14)** be **DENIED**, and the ALJ's decision be **AFFIRMED**.


Dated: October 6, 2021                    s/David R. Grand
Ann Arbor, Michigan                       DAVID R. GRAND
                                          United States Magistrate Judge


## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also*

*Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 6, 2021.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager